COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

ESTATE of Harry Stoll LEYMAN, Deceased, Harry S. Leyman, Jr., Executor, Respondent.

ESTATE of Harry Stoll LEYMAN, Deceased, Harry S. Leyman, Jr., Executor, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 15653 and 15732.

United States Court of Appeals Sixth Circuit.

March 29, 1965.

Argued by Norman Sepenuk, Dept. of Justice, Washington, D. C., John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Joseph M. Howard, Attys., Dept. of Justice, Washington, D. C., on the brief, for Commissioner of Internal Revenue.

Argued by William R. Seaman, Cincinnati, Ohio, Sherman E. Unger, Ronald E. Heinlen, Cincinnati, Ohio, on the brief, Frost & Jacobs, Cincinnati, Ohio, of counsel, for estate of Harry Stoll Leyman, etc.

Before PHILLIPS and EDWARDS, Circuit Judges, and PRETTYMAN, Senior Circuit Judge.*

PRETTYMAN, Senior Circuit Judge.

These are petitions to review a decision of the Tax Court of the United States, which held fraud in an estate tax case and adjudged additional taxes and fraud penalties to be due. Decedent was a business man of wide interests. His executor is his son. The estate tax return was timely filed and showed a tax due in the sum of $2,046,158.28, which was paid in full. As the result of a mathematical error on the return, an additional tax of $10,313.63 was paid by the estate a month after the return was filed. The Tax Court found deficiencies in tax of $1,240,-242.15 and additions to tax (i. e., penalties) of $620,121.08. Both the Commissioner of Internal Revenue and the exec-utor of the estate filed petitions for review in this court. They are consolidated for purposes of argument and decision.

In brief, the executor contends (1) that the Commissioner failed to establish fraud by clear and convincing evidence, (2) that the Tax Court erred in admitting in evidence proof of the fact that the executor was convicted of fraud in this matter upon a plea of *nolo contendere*, and (3) that the Tax Court erred in including in the gross estate a certain $15,000 in municipal bonds. The Commissioner contends the opposite to each of the foregoing points and further contends that the Tax Court erred in fixing the fraud penalty at 50 per cent of the deficiency in tax instead of at 50 per cent of the total estate tax.

I

The first problem is whether the Tax Court was clearly erroneous in its conclusion in respect to $613,314.52 cash. It found the Commissioner had established by clear and convincing evidence that the executor knowingly and willfully omitted these funds from the estate tax return, intending thereby to evade an estate tax due. We have little difficulty in agreeing with the Tax Court.

Decedent died on May 24, 1954, being then 82 years of age. He and his family of one son and three daughters owned, *inter alia*, the outstanding stock in a corporation known as Leyman Corporation, which in turn owned a portfolio of securities, extensive real estate, and certain subsidiaries which operated automobile sales agencies. The family had other business interests. The son was forty years old at the time of his father's death. For many years he had been an active participant in the family's affairs, having been second in line of command in many of them. When the father died, the son became the operating head of these companies. His father's private secretary became his private secretary. He had been in constant touch with his father for several years prior to the latter's death, had power to sign checks

* Sitting by designation from the District of Columbia Circuit.

on his personal account, went often with him on financial errands, etc.

The Leyman Corporation had a safe deposit box on rent in a bank. It was a large combination box, behind one door of which were five separate drawers, one of which was substantially filled with currency, totaling $613,314.52. The decedent's son, the executor, first saw currency in this box in 1943 or 1944, some ten years before his father's death. In December, 1953, some months before his death, decedent took some bonds (about $120,000) from a box in his room at home, gave them to his son, and told him to sell them and put a certain part of the proceeds in this corporate safe deposit box. Upon the trial of this case it was stipulated that the cash in the box belonged to decedent.

The executor did not include any of the cash in the box in the estate tax return. He said he thought the cash belonged to the corporation. In response to this claim the Commissioner pointed out (1) that the executor, as a director and officer of the corporation, saw its balance sheets and other financial statements and knew that no such item of cash appeared in them, and (2) that the corporation several times borrowed cash from banks for corporate purposes, which needs could easily have been met by recourse to the sums in the lock box.

When the Internal Revenue examination of the estate tax return got under way and the examining agent had proceeded with some phases of his inquiry, the executor advised his accountant and his attorney of the existence of the cash in the box and instructed them to inform the agent.

The record contains quantities of detail concerning this cash and the safe deposit box. It leaves little doubt that the executor knew of this cash, knew it had been his father's, and knowingly failed to include it in the return.

## II

The second issue is whether the Commissioner had the burden of proving that some $15,000 in municipal bonds were not reported on the estate tax return or included in the $613,314.52 in cash not reported on the return. The Commissioner's deficiency notice set forth a list of $54,000 in bonds as having been omitted from the estate tax return. Later he conceded error as to all but $15,000 of these bonds. It is the taxpayer's contention that, since there was error in some of the items in the original determination by the Commissioner, the presumption of validity which originally attached to the other items no longer applies. The contention is not tenable. The burden shifts to the Commissioner if the record shows that his original determination was arbitrary and excessive.[1] But the record in this case does not indicate that the Commissioner's determination as to these bonds was arbitrary or excessive. It is undisputed that they belonged to the decedent at his death. The only issue is whether the proceeds from the redemption of these bonds was included in the $613,-314.52 of cash not reported on the return. The Tax Court correctly held there was insufficient evidence to trace the proceeds of these bonds to the safe deposit box cash. Under these circumstances the Commissioner's determination that the bonds should have been reported on the return is still presumptively correct.

## III

Upon the trial the Government offered in evidence a certified copy of a judgment of conviction entered by a United States District Court against this executor in a criminal case based upon the falsity of this estate tax return. The judgment recited that it was "upon his plea of Nolo Contendere." The Tax Court admitted the document "for the purpose of credibility both of the witness and the return and as part of the

---

1. Durkee v. Commissioner of Internal Revenue, 162 F.2d 184, 173 A.L.R. 553 (6th Cir. 1947).

general background of the case * * *." The executor says the admission of this evidence was reversible error. We think it was not.

This was not a jury case but was trial by a judge, not likely to be confused as to the purport of these judicial proceedings. The judge pointed out she was not treating this evidence as "in the nature of a judicial admission". She did not refer to it in her discussion of the fraud issue. She relied entirely upon evidence apart from the criminal plea, as she should have done, but the plea and conviction were certainly part of the background material in this complicated set of facts.[2] The executor himself testified in the Tax Court, and the admission of his plea in the criminal case for purposes of impeachment is not disputed. The debate concerns only the additional purpose—as "background"— recited by the trial court in its ruling.

## IV

The more difficult question in the case concerns the amount of the civil penalty for fraud. Is it one-half the total tax payable on the estate? Or is it one-half the deficiency in the tax as stated on the return? The difference in dollars in this case is great.

The question divides into parts. The first part is: Which statute governs—the so-called 1939 code or the 1954 code? Congress reenacted the Internal Revenue Code in 1954. The new code clearly provided that the penalty for fraud in estate tax cases should be 50 per cent of the "underpayment".[3] It was enacted August 16, 1954. Decedent in the case now at bar died May 24, 1954. The effective date of the new law was fragmented· among subtitles, chapters, sections, subsections, paragraphs and subparagraphs. However the general affirmations of the new code are that it applied to estates of decedents dying after the date of the new enactment.[4] An analysis in minute detail confirms that impression in respect to the estate tax fraud penalty, which is the only matter here involved. The Tax Court thought the correct view to be that the law in existence when this decedent died, i. e., the 1939 code, was applicable here,[5] and we agree. We pause to detail in a footnote the intricacies of this examination.[6]

We come then to consider what the 1939 code provided in respect to civil penalties for fraud in estate tax cases. The provision is in Section 3612(d) (2) of that Code.[7] The Tax Court, agree-

---

2. Kilpatrick v. Commissioner of. Internal Revenue, 227 F.2d 240, 243–244 (5th Cir. 1955); A. B. Dick Co. v. Marr, 95 F. Supp. 83, 101 (S.D.N.Y.1950), appeal dismissed, 197 F.2d 498 (2d Cir.), cert. denied, 344 U.S. 878, 73 S.Ct. 169, 97 L.Ed. 680 (1952).

3. Int.Rev.Code of 1954, § 6653(b).

4. Id. § 7851(a) (2) (A).

5. 40 T.C. 100, 123–125 (1963).

6. The decedent died on May 24, 1954, and the estate tax return was filed on July 21, 1955. The date of enactment of the 1954 code, was, as we have said, August 16, 1954. Section 7851(a) (2) (A) of the new code provided that the estate tax imposed by the 1939 code, subtitle B, chapter 11, should apply to the estates of decedents dying before August 17, 1954, and thus to the estate of the decedent in this case. Section 3612(d) (2) of the 1939 code, which imposes the estate tax civil fraud penalty, is

part of subtitle D of the 1939 code. Section 7851(a) (6) (D) of the 1954 code provides that subtitle D of the 1939 code "shall remain in effect with respect to taxes imposed by the Internal Revenue Code of 1939." Since the taxes in this case were imposed by the 1939 code, the addition to tax "with respect to" those taxes, which was imposed by section 3612(d) (2) of the 1939 code, remained in effect. Rev.Rul. 54–427, 1954– 2 C.B. 42.

7. The pertinent parts are:
   "SEC. 3612.  RETURNS EXECUTED BY COMMISSIONER OR COLLECTOR.

   "(a) Authority of collector.—If any person fails to make and file a return or list at the time prescribed by law or by regulation made under authority of law, or makes, willfully or otherwise, a false or fraudulent return or list, the collector or deputy collector shall make the return or list from his own knowledge and

ing with the executor, was of the view that the penalty thus provided was 50 per cent of the understatement in tax. The Government disagrees. It is earnest in insisting that the penalty is 50 per cent of the total tax imposed by the statute upon the estate; i. e., that which is shown on the return plus that which is not thus shown. Thus it is obvious that a problem is posed on the point. We agree with the Government's position.

The solution to the problem of the meaning of this 1939 statute is historical rather than philosophical.[8] Originally, from 1791, all internal federal taxes were "indirect" taxes, "excises"—taxes imposed upon an event or the exercise of a right.[9] They were paid in large part by the affixing of stamps.[10] The con-

stitutional requirement[11] that "direct" taxes be laid "in proportion to the Census" proved to be so cumbersome as to prevent such taxation for long by the Federal Government, although it was tried several times.[12] There were no *ad valorem* penalties for fraudulent returns of these early taxes. Specific dollar amounts of penalties and direct forfeiture of goods (such as distilled spirits and tobacco) on which the tax had not been paid, were simpler and more sensible.[13] Thus it was until the War Between the States necessitated vast increases in federal revenue.

The income tax and the inheritance tax came into the federal system at about the same time, 1861 and 1862.[14] Both of these taxes, as reenacted in 1864,

from such information as he can obtain through testimony or otherwise.

"(b) Authority of Commissioner.—In any such case the Commissioner may, from his own knowledge and from such information as he can obtain through tesmony or otherwise—

"(1) To make return.—Make a return, or

"(2) To amend collector's return.— Amend any return made by a collector or deputy collector.

\* \* \* \* \*

"(d) Additions to tax.—

"(1) Failure to file return.—In case of any failure to make and file a return or list within the time prescribed by law, or prescribed by the Commissioner or the collector in pursuance of law, the Commissioner shall add to the tax 25 per centum of its amount, \* \* \*.

"(2) Fraud.—In case a false or fraudulent return or list is willfully made, the Commissioner shall add to the tax 50 per centum of its amount.

"(3) Cross reference.—

"For additions to tax in the case of income tax, see sections 291 and 293, and in the case of a deficiency in gift tax, see section 1019."

8. In New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921), which held the federal estate tax constitutional, Mr. Justice Holmes wrote, " \* \* \* a page of history is worth a volume of logic."

9. The first internal taxes enacted in the United States were in the Act of March 3, 1791, ch. 15, 1 Stat. 199. Other

revenue acts kept a system of internal taxes in force until 1802. Act of May 8, 1792, ch. 32, 1 Stat. 267; Act of June 5, 1794, ch. 49, 1 Stat. 378; Act of July 6, 1797, ch. 11, 1 Stat. 527; Act of July 9, 1798, ch. 70, 1 Stat 580. There were no internal taxes from 1802 to 1813. From 1813 until 1817 another system of internal taxes was in force. Act of July 22, 1813, ch. 16, 3 Stat. 22; Act of July 24, 1813, ch. 21, 3 Stat. 35; Act of July 24, 1813, ch. 24, 3 Stat. 40; Act of July 24, 1813, ch. 25, 3 Stat. 42; Act of Aug. 2, 1813, ch. 37, 3 Stat. 53; Act of Dec. 21, 1814, ch. 15, 3 Stat. 152; Act of Apr. 19, 1816, ch. 58, 3 Stat. 291. From 1817 until 1861 there were no internal taxes in the United States.

10. As on tobacco, etc. Even the first federal death tax was a stamp tax on receipts given for legacies. Act of July 6, 1797, ch. 11, § 1, 1 Stat. 527.

11. U.S.Const. art. I, § 9, cl. 4; and art. I, § 2, cl. 3.

12. E. g., Act of July 9, 1798, ch. 70, 1 Stat. 580; Act of July 22, 1813, ch. 16, 3 Stat. 22; Act of Aug. 2, 1813, ch. 37, 3 Stat. 53; Act of Aug. 5, 1861, ch. 45, 12 Stat. 292.

13. E. g., Act of March 3, 1791, §§ 27, 28, 32, ch. 15, 1 Stat. 199, 206–207; Act of July 24, 1813, §§ 2, 6, ch. 21, 3 Stat. 35; Act of Dec. 21, 1814, § 6, ch. 25, 3 Stat. 152.

14. Act of Aug. 5, 1861, ch. 45, 12 Stat. 292 (income tax); Act of July 1, 1862, ch. 119, 12 Stat. 432, 485 (inheritance tax).

1865 and 1866,[15] were held to be indirect taxes and constitutional.[16] No *ad valorem* civil penalties were provided in the 1861 and 1862 Acts, but in 1864 the Congress, reenacting the internal tax system, put in a provision that "in case of the return of a false or fraudulent list or valuation, he [the assessor] shall add one hundred per centum to such duty".[17] Although the inheritance tax and income tax were repealed in 1870 and 1872, respectively,[18] this provision for an *ad valorem* civil fraud penalty continued in effect and applied to other internal taxes as a general administrative provision. The provision, as amended,[19] was incorporated into the Second Edition of the Revised States in 1878 as Section 3176. It remained in force as such until incorporated into the 1939 Code as Section 3612(d) (2).

The inheritance tax and the later estate tax have always been held to be indirect taxes or excises and on this basis have been held constitutional, even though not apportioned on the basis of the census.[20] But the income tax had a different history. In 1894 Congress again enacted an income tax.[21] And in 1895 the Supreme Court changed its mind about that tax and held it to be a direct tax and unconstitutional because not apportioned according to the census.[22]

A constitutional amendment was thus made necessary and was adopted as of February 25, 1913.[23] Thus the income tax, a direct tax not required to be apportioned according to the census, fell into a niche all its own. Congress in 1918 undertook to write complete administrative provisions for the newly conceived income tax. In the 1918 Act it included a provision that the penalty for a false and fraudulent income tax return be an *ad valorem* penalty of 50 per cent of "the deficiency".[24]

Thus the matter stood, the estate tax among the other indirect or excise taxes, administratively under Section 3176 of the Revised Statutes and its counterpart, Section 3612(d) (2) of the 1939 code, and the income tax separate and apart in a category all its own, until the 1954 code was being written. By that time the old distinctions between direct and indirect taxes, so essential to the constitutional validity of taxes in earlier days, had largely faded from view.[25] More practical notions prevailed. An estate tax looked like an imposition directly upon the property involved, instead of upon the right to transmit or the fact of transmission. At any rate the estate tax and the income tax looked much alike administratively to the Congress in the 1950's. And so the penalties

15. Act of June 30, 1864, ch. 173, 13 Stat. 223; Act of March 3, 1865, ch. 78, 13 Stat. 469; Act of July 13, 1866, ch. 184, 14 Stat. 98.

16. Scholey v. Rew, 90 U.S. 331 (1874) (inheritance tax); Springer v. United States, 102 U.S. 586, 26 L.Ed. 253 (1880) (income tax).

17. Act of June 30, 1864, § 14, ch. 173, 13 Stat. 223, 227.

18. Act of July 14, 1870, ch. 255, 16 Stat. 256; Act of June 6, 1872, ch. 315, 17 Stat. 230.

19. Act of March 3, 1865, § 1, ch. 78, 13 Stat. 469; Act of July 13, 1866, § 9, ch. 184, 14 Stat. 101.

20. Scholey v. Rew, 23 Wall. 331, 90 U.S. 331, 23 L.Ed. 99 (1874); Knowlton v. Moore, 178 U.S. 41, 81, 20 S.Ct. 747, 44 L.Ed. 969 (1900); New York Trust Co. v. Eisner, 256 U.S. 345, 41 S.Ct. 506 (1921).

21. Act of Aug. 27, 1894, ch. 349, 28 Stat. 509, 553.

22. Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895), rehearing, 158 U.S. 601, 15 S. Ct. 912, 39 L.Ed. 1108 (1895).

23. U.S.Const. amend. XVI.

24. Revenue Act of 1918, § 250, ch. 18, 40 Stat. 1057, 1083.

25. The 1924 gift tax was repealed in 1926; but when it was reenacted in 1932 Congress adapted the income tax fraud penalty to the gift tax rather than incorporate by reference Section 3176 of the Revised Statutes, which was applicable to the estate tax and other taxes and which had been applicable to the 1924 gift tax. Thus the new gift tax penalty was 50 per cent of "the deficiency". Revenue Act of 1932, § 520(b), ch. 209, 47 Stat. 169, 255.

for fraud were made alike. But until then the gulf between indirect taxes as a group and the income tax, separate by amendment, had retained its historical being and significance.

The administrative construction of the penalty provisions is not helpful one way or the other. In 1899 the Commissioner directed [26] that the 100 per cent penalty "is always computed upon the amount actually due over and above that shown to be due by the false return." In 1915 his successor in office held [27] that the 100 per cent penalty imposed for the filing of false or fraudulent returns "applies to the full amount of the tax involved", and he revoked that portion of the 1899 decision which had held to the contrary. Apparently his view was uniformly applied under Section 3176 of the Revised Statutes and Section 3612(d) (2) of the 1939 code until the change made by the 1954 code.

The few scattered court cases which appear in the reports follow the pattern of the administrative decisions, but either the measure of the penalty was not litigated or the conclusion was "no fraud".[28] So these cases are of little authoritative purport in the pending problem.

The textbooks state the matter clearly and succinctly,[29] and they state the rule as we have found it to be.

The executor says that Section 3612 of the 1939 code—the whole section—deals with returns made out by the Commissioner or a collector (when the taxpayer files no return or files a false one) and that when subsection (d) of that section speaks of "the tax" it means the additional tax shown by the Commissioner. This seems to us to be at best a strained construction. The subsection (i e., (d)) says that in case of fraud the Commissioner "shall add to the tax 50 per centum of its amount." These words are not obscure in their meaning. Indeed, in the immediately preceding sentence the statute treats of additions to the tax in the case of a failure to file a return on time, and it there provides that "the Commissioner shall add to the tax 25 per centum of its amount". The words obviously refer to the whole tax, there being no deficiency less than the whole.[30] So the same words in the next sentence in the statute would seem to have the same meaning.

The plain fact of the matter is that Congress wrote an entire treatment of the income tax when that tax was carved out of the melange of federal revenue provisions, but until 1954 it left the estate tax with the other indirect, or excise, taxes. This latter treatment accorded with the historical concepts of such taxes. In the 1939 code the penalty for a false income tax return was pre-

26. T.D. 21517, 2 Treas.Dec.Int.Rev. 281 (1899).

27. T.D. 2266, 17 Treas.Dec.Int.Rev. 263 (1915). See also Treas.Reg. 46 § 316.-205(e) (1940); Treas.Reg. 43 § 101.44 (e) (1941); Treas.Reg. 42 § 130.79(e) (1942); Treas.Reg. 113 § 143.62 (1943); Treas.Reg. 51 § 320.77(e) (1920); Treas.Reg. 119 § 324.46(e) (1953); Treas.Reg. 59 § 323.49 (1921).

28. Pre-1915 cases: Doll v. Evans, 7 Fed. Cas. 855 (No. 3969) (C.C.E.D.Pa.1872); Michigan Cent. R. Co. v. Slack, 17 Fed. Cas. 262 (No. 9527) (C.C.D.Mass.1873); German Sav. Bank v. Archbold, 10 Fed. Cas. 260 (No. 5364) (C.C.S.D.N.Y.1878), reversed, 104 U.S. 708, 26 L.Ed. 901 (1879).

  Post-1915 cases: Beam v. Hamilton, 289 F. 9 (6th Cir. 1923); John H. Collinson, 1 B.T.A. 561 (1925); F. W. Luk-ins, 3 B.T.A. 204 (1925); Joy D. (Lockwood) Wills, 9 P-H B.T.A. Mem. 51 (1940); Stiles v. United States, 58-2 U.S.T.C. 69,931 (S.D.Fla.1958); Estate of Schneller, 28 P-H Tax Ct. Mem. 570 (1959); Estate of Lottie Hamar, 29 P-H Tax Ct. Mem. 643 (1960).

29. P-H Fed. Tax Serv. 42–43 (1919); Montgomery, Income Tax Procedure 135 (1922); Montgomery, Income Tax Procedure 171 (1924); Montgomery, Income Tax Procedure, Vol. I, p. 220 (1926); Montgomery, Federal Tax Practice 202 (1929); Montgomery, Federal Tax Handbook 706 (1932); Montgomery Federal Tax Handbook 820 (1933–34); Montgomery, Federal Tax Handbook 858 (1934–35); Balter, Fraud Under Federal Tax Law 121 (1951 ed.).

30. American Milk Products Corp. v. United States, 41 F.2d 966 (Ct.Cl.1930).

scribed as a percentage of "the deficiency" (Sec. 293(b)); the penalty for false returns of indirect, or excise, taxes generally (Sec. 3612) was a percentage of "the tax". The difference, as our study shows, was not due to inadvertence, carelessness, or lack of understanding. It was the result of long, slow, not illogical development in the law. Concepts had by that time reached a certain stage in their legislative development. Later, they moved further in the direction of similarity. But it is not for the courts to anticipate such later developments, or to guess what Congress might have done had it not done what it did. Change in existing statutory provisions is for the legislature. We think the courts must apply the statutory terms as they existed on the critical date in a given case.

We are told that this is a case of first impression. To eyes and ears in the 1960's it seems strange that this should be so. But upon examination several explanatory features appear. Usually the person who must make the return (the executor) has only a small interest dependent upon the amount of the estate; his in-pocket gleaning from fraud is not worth the potential criminal risks. Also estate tax returns are fewer in number, and usually estate taxes of notable amount receive penetrating attention from the authorities. These are antifraud factors. On the other hand it also appears that the courts have been reluctant to find fraud in these cases, as the cases cited in our note 28, supra, show. At any rate we are presented, so far as we can ascertain, with a problem as to which we have no guiding casebook authority.

## V

The judgment of the Tax Court must be set aside and the case remanded to that court for a computation and imposition of a civil fraud penalty in accordance with this opinion. In all other respects the judgment and decision of the Tax Court is affirmed.

So ordered.